**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CHERY D. MAUTHE,** | |
| **Plaintiff,** | **No. 16 C 8889** |
| **v.** | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Chery Mauthe ("Claimant") brings this motion for summary judgment [12] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under §§ 416(i) and 423(d) of the Social Security Act (the "Act"). The Commissioner has filed a cross-motion for summary judgment [17] asking the Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction pursuant to 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, this matter is remanded for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Procedural History

On June 6, 2012, Claimant filed a Title II application for a period of disability and DIB, as well as a Title XVI application for SSI. (R. 19.) In both applications, Claimant alleged disability beginning December 9, 2011. (*Id.*) These claims were denied initially

on September 6, 2012, and on reconsideration on January 14, 2013, after which Claimant filed a timely request for a rehearing. (*Id.*) On October 17, 2014, Claimant, represented by counsel, testified before ALJ Jessica Inouye. (R. 109.) The ALJ also heard testimony by Lee O. Knutson, a vocational expert ("VE"). (R. 210–28.)

After the hearing, additional records pertaining to Claimant's workers' compensation record were submitted into evidence. (R. 19.) A supplemental hearing was held on November 21, 2014, to allow Claimant's representative additional time to question the VE. (R. 59–108.) On February 13, 2015, the ALJ denied Claimant's claims for both DIB and SSI, finding her not disabled under the Act. (R. 16–51.) The Social Security Administration Appeals Council then denied Claimant's request for review on July 12, 2016 (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## B. Medical Evidence

### 1. Physical Health Treatment Records

On December 9, 2011, Claimant slipped and fell on her way to work. (R. 128, 655, 992.) She subsequently presented to the Glenbrook Emergency Room, where she was diagnosed with a contusion of the knee, wrist strain, and a sprain of the lumbar region. (R. 1012.) Claimant testified that she fell a second time a few days later, and followed up with her primary care physician, Kirsten Hefele, M.D.[1], presenting with multiple complaints of pain, including neck pain, back pain, and right knee pain. (R.

---

[1] Dr. Hefele had a practice with Dr. Colette Gordon, whom Claimant also saw in subsequent visits. The medical records from the visits are handwritten and illegible at times; therefore it is occasionally unclear which physician treated Claimant.

992–93, 1010.)  Dr. Hefele prescribed muscle relaxants, pain medications and anti-inflammatories, and referred Claimant to physical therapy.  (R. 1010, 1113.)

At Dr. Hefele's recommendation, Claimant underwent a physical therapy evaluation at Swedish Covenant Hospital on December 21, 2011.  (R. 615–18.)  The examination demonstrated increased low back pain with forward flexion, poor abdominal stability, impaired right shoulder mobility/strength, weakness of intrinsic cervical musculature and overall pain with functional activities.  (R. 616.)  Claimant rated her pain between a six-to-nine out of ten.  (R. 615.)  She attended four physical therapy sessions in January 2012, where she consistently demonstrated increased pain levels to all components of treatment, limiting her ability to perform treatment.  (R. 619–30.)  She opted to discontinue physical therapy, stating that she was in too much pain.  (R. 651, 981, 1096.)

On January 16, 2012, Claimant saw Dr. Colette Gordon, who documented that Claimant's chief complaint was back pain, with the additional complaints of anxiety, difficulty breathing, headache, and broken/fractured bone.  (R. 656.)  On January 17, Dr. Hefele noted that Claimant's ability to return to work would depend on her ability to improve her pain through physical therapy, medications, and possible steroid injections.  (R. 1010.)  On January 31, 2012, Dr. Hefele referred Claimant to a neurosurgeon, Roger A. Lichtenbaum, M.D.  (R. 1009.)

An MRI of the cervical spine was performed on January 27, 2012, and revealed evidence of a prominent broad-based posterocentral herniation at the C6-C7 level, with effacement of the ventral thecal sac, and significant central canal stenosis.  (R. 719.)  The report indicates significant impingement upon the ventral aspect of the cervical

3

cord, and Claimant was diagnosed with cervical spondylosis with multilevel endplate spurring and neuroforaminal bulging. (*Id.*) The interpreting radiologist noted the limited nature of the study due to patient movement, and recommended a repeat or follow-up MRI should clinical concerns persist. (*Id.*)

On February 14, 2012, Claimant presented to Dr. Lichtenbaum with complaints of headaches, neck pain, and back pain radiating from the mid to lower back. (R. 944.) She also reported hand numbness, dropping objects, and difficulty holding objects. (*Id.*) She explained that her attempts at physical therapy and aquatic therapy made these symptoms worse, and that she was currently working as a home healthcare provider. (*Id.*) Physical examination revealed five out of five strength and intact sensation to the bilateral upper and lower extremities and pain when raising arms above the head. (*Id.*) Dr. Lichtenbaum ordered Claimant to remain off work for the next two months. (R. 953.)

In March, Plaintiff received her first cervical epidural steroid injection. (R. 1089.) Claimant had a follow-up appointment with Dr. Gordon on May 17, 2012. (R. 650.) Dr. Gordon documented that Claimant complained of migraines and needed to go to a pain clinic. (*Id.*) In May 2012, Dr. Marek Rozynek, a pain management specialist, prescribed a TENS unit, Nucynta and Neurontin, and referred Claimant to physical therapy. (R. 678–79.) At that time, Dr. Rozynek indicated that Claimant should remain off work until further notice. (R. 1108.) Claimant received additional cervical epidural steroid injections in May 2012 and July 2012. (R. 686–87, 825–28.)

Claimant returned to Dr. Lichtenbaum on August 7, 2012, with complaints of pain between her shoulder blades going up into her neck and head, and also in her lower back. (R. 942.) She reported that the injection therapy had not provided any significant

relief, and that she was unable to follow through with the physical therapy referral because of her pain. (*Id.*) Claimant additionally reported that, when the pain was bad, it was intolerable and she could not do much to alleviate it. (*Id.*) Dr. Lichtenbaum recommended Claimant remain off work for another three months. (R. 942, 1114.) Dr. Lichtenbaum further observed that Claimant was "quite cheerful and difficult to keep focused," and opined that "there may be a supratentorial component to her pain." (*Id.*)

A new MRI of the cervical spine was performed on August 13, 2012, and Claimant followed up with Dr. Lichtenbaum on August 30, 2012. (R. 940.) Dr. Lichtenbaum observed progression of the C6-C7 herniated disc with significant canal compromise and cord compression. (*Id.*) However, according to the interpreting radiologist, the MRI revealed only a redemonstration of broad right paracentral disc herniation at C6-C7 extending laterally and superiorly. (R. 726.) The interpreting radiologist indicated that this finding was unchanged to minimally worse as compared to the January 2012 MRI. (R. 726.) Dr. Lichtenbaum opined that additional non-operative treatment, such as physical therapy, was unlikely to provide any benefit based on the severity of Claimant's symptoms. (R. 940.) A C6-C7 anterior discectomy and fusion was recommended. (*Id.*)

On September 28, 2012, Claimant presented to the emergency room at Saint Mary's Medical Center with chief complaints of right-sided facial numbness, neck pain, and back pain. (R. 810–11.) She was prescribed Ibuprofen and Lorazepam and was discharged home that same day. (R. 814.) Claimant was seen by her primary care doctor on January 22, 2013, and presented with chronic back and neck pain as well as

anxiety and depression.  (R. 973, 978.)  She also reported falling and feeling dizzy.  (R. 978.)  Her doctor noted that she was not a good historian.  (*Id.*)

Claimant returned to Dr. Lichtenbaum on March 19, 2013, complaining of continued neck, arm, and low back pain, stiffness, and bilateral foot numbness.  (R. 937–38.)  She reported that she had sustained multiple falls and felt like she had difficulty holding objects.  (*Id.*)  Dr. Lichtenbaum observed significant pressured speech and flight of ideas during the office visit.  (R. 937.)  Nancy Tutor, APN, noted that Claimant exhibited manic speech in the office, that Claimant had difficulty holding objects, and that her pain was stabbing in the neck and worst in the lower back.  (R. 938.)  Claimant also expressed an interest in surgery.  (*Id.*)  New MRIs of the cervical and lumbar spine were ordered, and it was recommended that Claimant follow up with Dr. Gordon for possible psychiatric treatment and stabilization.  (R. 937.)

MRIs of the cervical spine and lumbar spine were performed on March 22, 2013.  (R. 946–47.)  The MRI of the cervical spine revealed disc desiccation with endplate degenerative change, and disc bulging and spurring and mild to moderate central canal stenosis.  (R. 946.)  The MRI of the lumbar spine revealed only mild facet degenerative changes at the L5-S1 level; there was no focal disc herniation or central canal stenosis observed.  (R. 947.)

During an April 4, 2013 appointment with Dr. Gordon's office, Claimant had tangential speech and crying episodes, but reported having an appointment with a behavioral health expert.  (R. 971.)  She stated that the back and neck pain continued to radiate.  (*Id.*)

On June 13, 2013, Claimant presented to the emergency room at Swedish Covenant Hospital with complaints of hip pain. (R. 1064–79.) She reported that she had been experiencing bilateral hip pain and weakness ever since her December 2011 fall, and that this pain had progressed. (R. 1065.) She stated that the pain could be severe, and that it waxed and waned and radiated down both legs and up to the back. (*Id.*) X-rays of the hips were within normal limits, and there was no evidence of sensory deficits upon physical examination. (R. 1065–67.) Claimant's symptoms improved with the administration of morphine, and it was recommended that she return to her orthopedist and neurosurgeon for further evaluation. (R. 1065–69.)

On August 20, 2013, Claimant saw her primary care physician and complained of inguinal pain. (R. 967.) The doctor assessed fibromyalgia, prescribed Savella, and noted that Claimant refused a test for her pain. (*Id.*) On September 10, 2013, Claimant was taken by ambulance to Swedish Covenant Hospital, complaining of severe, sharp back pain. (R. 1039, 1048.) She reportedly felt a sharp pain in the middle of her back as she was getting out of bed. (R. 1050.) Physical examination of the back was relatively normal, with mild tenderness noted in the mid-thoracic and left paraspinal areas. (R. 1054.) Claimant was observed to be walking very slowly. (R. 1050, 1055.) She was prescribed Naproxen and Flexeril and was discharged home with instructions to follow up with her primary care physician. (R. 1056–57, 1063.)

On October 23, 2013, Claimant reported to her primary care physician that her leg was cramping day and night. (R. 965.) Claimant next sought treatment from the Erie Foster Health Center on November 19, 2013, where she was treated by Marc Sheinman, D.O., an internal medicine provider. (R. 839–45.) She reported pain from

the neck down her spine into her legs, and rated her pain at a ten out of ten in severity. (R. 844.) Dr. Sheinman noted that Claimant exhibited "very pressured speech with flight of ideas, bouncing from topic to topic." (R. 839.) Claimant also reported admitted arm and leg weakness, decreased vision, and gait instability. (R. 839.) Dr. Sheinman issued referrals for physical therapy, a neurosurgery second opinion, and the behavioral health clinic for anxiety and depression. (R. 839–42, 845, 1144.) Claimant returned to the Erie Foster Health Center on December 20, 2013, for a refill of levothyroxine, and was treated by Dr. Mark Simon. (R. 846.)

On February 3, 2014, Claimant presented to neurosurgeon Jerrel H. Boyer, D.O., with complaints of low back and neck pain with bilateral hand and feet numbness. (R. 1024–27.) Claimant's speech was noted to be "somewhat rambling," and she did not answer questions directly. (R. 1024.) Dr. Boyer documented that Claimant had received multiple injections in her neck that were not effective, and that "it seemed like she declined injections in her lumbar spine." (*Id.*) There was normal sensation and five out of five strength in all extremities. (R. 1025–26.) An MRI of the cervical spine revealed a significant disc bulge with cord compression predominantly at C5-C6. (R. 1026.) Dr. Boyer observed nonphysiologic tenderness throughout Claimant's thoracic cervical and lumbar spine; and the examination was noted to be difficult because of Claimant's "perceived pain levels." (*Id.*) Dr. Boyer assessed low back pain, cervical spine degeneration, and cervical radiculopathy, and ordered updated imaging of the lumbar spine cervical spine. (*Id.*) Further, Dr. Boyer noted that Claimant appeared to have significant cord compression, but that her films needed to be repeated. (*Id.*) It

was also his opinion that while Claimant would likely require surgical intervention to protect her spinal cord injury, he was not sure surgery would alleviate the pain. (*Id.*)

Claimant returned to Dr. Simon the day after her visit with Dr. Boyer. (R. 853–55.) Dr. Simon noted that Claimant became tearful and seemed "truly desperate." (R. 854.) X-rays of the lumbar spine on February 14, 2014 showed tiny marginal spurs, but there was no evidence of fracture or degenerative changes. (R. 1081.) A CT of the cervical spine from the same day revealed degenerative disc disease with a closed cervical lordosis and a mild disc bulge and hypertrophic arthropathy at C6-C7, producing mild central and left foraminal stenosis. (R. 1083.) An MRI of the cervical spine demonstrated disc protrusions at the levels of C3-C4, C5-C6 and C6-C7, noted worse at C5-C6 and C6-C7 with C6-C7 being the most prominent disc protrusion. (R. 1085.) Effacement along the anterior thecal sac was noted throughout the above levels and was worse at C5-C6 and C6-C7. (*Id.*)

On March 3, 2014, Claimant again followed up with Dr. Simon and reported neck and back pain, accompanied by complaints of weakness, numbness, and tingling. (R. 856–57.) She stated that she fell after her last appointment with Dr. Boyer, injuring her right hand and leg. (R. 857.) Physical examination revealed tenderness at the cervical spine area and the back of the neck. (*Id.*)

On April 4, 2014, Claimant followed up with Dr. Boyer with complaints of neck pain with radiation down her arms associated with numbness, right buttocks pain and right leg pain. (R. 1020.) The February 2014 MRI and CT of the cervical spine were reviewed; Dr. Boyer opined that the imaging demonstrated improvement in Claimant's cervical disc herniations and that there was no significant cord compression, noting no

high signal within the cord.  (R. 1022.)  Claimant reported that her pain was "all over," though Dr. Boyer noted that the pain "does not follow particular dermatomal distribution that would be referrable to her local disc herniations."  (*Id.*)  Dr. Boyer concluded that Claimant was a poor surgical candidate.  (*Id.*)  He assessed low back pain and cervical spine degeneration and referred her to Xiaoyuan Xie, M.D., for evaluation and pain management.  (*Id.*)  On April 14, 2014, Claimant saw Dr. Simon again complaining of neck and back pain, and pain and numbness of the right arm.  (R. 860.)  Dr. Simon continued to note that Claimant seemed "slowed."  (R. 854, 864.)  He recommended physical therapy, prescribed Zoloft for depression, and referred Claimant to the pain clinic.  (R. 860–61.)

Claimant presented to Dr. Xie in May 2014.  (R. 1034–137.)  Dr. Xie noted normal flexion of the cervical spine, but decreased extension and decreased range of motion with left lateral bending and side-to-side rotation of the neck.  (R. 1036.)  Claimant also had some tenderness to palpitation in the cervical paraspinal area bilaterally.  (*Id.*)  Dr. Xie found decreased range of motion in the lumbar spine.  (*Id.*)  Claimant walked with a normal gait and demonstrated the ability to heel and toe walk.  (*Id.*)  There was normal range of motion in the upper and lower extremities, and Claimant had intact sensation and reflexes throughout.  (*Id.*)  A May 2014 MRI of the lumbar spine revealed mild degenerative disc disease at the L2-L3 and L3-L4 levels and facet arthritis at the L4-L5 and L5-S1 levels.  (R. 1080.)  Dr. Xie recommended a cervical spine facet block to help control Claimant's complaints of continued neck pain, which was performed the following week.  (R. 1028–33.)

When Claimant returned to Dr. Simon in July 2014, she reported that the injection she received from Dr. Xie only made her pain worse. (R. 863.) Dr. Simon noted that Claimant was "almost in tears with a desperation in her voice that she always has," although besides her desperate voice she appeared well and in no obvious distress. (*Id.*) Claimant requested surgery, but it was not clear if she wanted surgery at both her neck and lower back. (*Id.*) Although Dr. Simon noted that Dr. Boyer had opined that surgery would do more harm than good, he referred Claimant back to Dr. Lichtenbaum for another opinion regarding surgical options. (R. 863–64.)

## 2. Treating Physician Physical Residual Function Capacity Statement

In October 2014, Dr. Simon completed a Physical Residual Function Capacity Statement on behalf of Claimant. (R. 872–75.) Dr. Simon listed Claimant's current diagnoses of lumbar back pain, a herniated cervical disc, cervical spondylosis, and hypothyroidism with poor prognosis. (R. 872.) He indicated that Claimant has not shown improvement. (*Id.*) Dr. Simon opined that Claimant may occasionally lift and carry up to 10 pounds, should avoid climbing ladders, ropes, and scaffolds, and does not need an assistive device for effective ambulation. (R. 874–75.) He further opined that Claimant should avoid climbing ramps and stairs, and is unable to walk one city block without rest or climb steps at a reasonable pace. (R. 873.) Dr. Simon indicated that Claimant's chronic neck and back pain and symptoms of radiation to her right arm cause severe and debilitating pain, making it difficult for Claimant to function, sit for prolonged periods, and turn her head. (R. 872.)

Dr. Simon also opined that Claimant's pain is severe enough to interfere with her attention and concentration on a constant basis, such that she would only occasionally

be able to perform simple work tasks.  (R. 872.)  He estimated that the claimant would be "off task" more than 30 percent of the time or would be at most, less than 50 percent productive on a sustained basis.  (R. 875.)  He further indicated that Claimant would be absent from work an average of two days per month, and opined that she would be unable to complete an eight-hour workday five or more days per month.  (*Id.*)

Dr. Simon additionally opined that Claimant has problems balancing when walking and is limited in her ability to stoop, crouch, and bend.  (R. 873.)  He indicated that she can sit for no more than 30 minutes at one time and for three hours total in an eight-hour workday and can stand for no more than 30 minutes at one time.  (R. 873-74.)  Claimant may also walk for up to 30 minutes at one time, and may stand and/or walk for a combined total of not more than one hour in an eight-hour workday.  (*Id.*)

Dr. Simon stated that Claimant must lie down or recline for 20 minutes to an hour during an eight hour workday due to pain, requires three to four unscheduled, 20-minute rest breaks throughout the day, and can use her hands, fingers, and arms for grasping, turning, twisting and other fine manipulations, or for reaching (including overhead), no more than ten percent of the time.  (R. 873–75.)  Lastly, Dr. Simon reported that he is "certain that [the claimant] cannot obtain and retain work" at this time.  (R. 875.)

### 3. Physical Health Independent Medical Evaluations

In April 2012, Edward Goldberg, M.D., performed an independent medical examination of Claimant in connection with her workers' compensation claim.  (R. 1092–97.)  Dr. Goldberg's examination and report pertained only to Claimant's cervical spine.  (R. 1092, 1095–96.)  At that time, Claimant reported posterior neck pain associated with spasms and bad headaches, pain traveling from the neck into the right

shoulder and triceps region, and some numbness in the right hand. (R. 1095.) Physical examination revealed cervical flexion limited of two inches of chin to chest with pain. (R. 1096.) Dr. Goldberg diagnosed a herniated nucleus pulposus at C6-C7, and recommended one month of physical therapy and cervical epidural injections. (*Id.*) He indicated that Claimant was unable to work at the present time. (*Id.*) However, in a May 18, 2012 addendum, Dr. Goldberg opined that Claimant could return to work with a 20-pound lifting restriction and no lifting overhead. (R. 1092.) Dr. Goldberg additionally stated that he did not detect signs of symptom magnification. (*Id.*)

In September 2012, Dr. Goldberg conducted a second examination. (R. 1087–91.) Claimant complained of neck pain and paresthesias diffusely in both hands. (R. 1089.) She reported that she dropped things with her right hand, and indicated that she experienced low back pain and numbness in both feet. (*Id.*) Claimant reported that she had multiple falls due to "pain." (*Id.*) Upon examination, Dr. Goldberg noted Claimant appeared to be in distress, with a slow and shuffling gait. (R. 1089–90.) Her cervical range of motion was approximately ten degrees flexion and extension, and rotation to the left and right of ten degrees. (R. 1090.) Tenderness was noted in the cervical, thoracic, and lumbar spines, and Claimant had diminished sensation in both hands diffusely. (*Id.*)

Dr. Goldberg opined that Claimant could return to work at that time as a van driver, as the job required no lifting, and involved walking less than half an hour at one time and sitting six to eight hours a day. (*Id.*) He recommended a functional capacity

evaluation ("FCE:)[2] in order to determine the validity of Claimant's complaints. (*Id.*) According to Dr. Goldberg, the FCE indicated that Claimant had inconsistent reliability and was capable of greater functional abilities than demonstrated. (R. 1087.) The FCE further indicated that Claimant was capable of working as a shuttle driver. (*Id.*) Based upon the results of the FCE, Dr. Goldberg opined that Claimant was at maximum medical improvement and able to return to work without restrictions. (*Id.*) Dr. Goldberg disagreed with Dr. Lichtenbaum's recommendation for surgery. (*Id.*)

### 4. Physical Health Agency Consultants

Dr. Alexander Panagos performed an internal medicine consultative examination on August 27, 2012. (R. 729–34.) Upon physical examination, Dr. Panagos noted cervical vertebral and paravertebral tenderness as well as lower lumbar vertebral and paravertebral tenderness in the lumbar spine. (R. 731.) Dr. Panagos documented that Claimant ambulated with a slow, shuffling gate and swayed from side to side when bearing weight. (*Id.*) Claimant had no difficulty getting onto and off the table and up from the chair, but was unable to do the heel walk and toe walk or the tandem gait. (*Id.*) Claimant could perform fine and gross motor movements and manipulations and make a fist with both hands, although she had mild difficulty opposing the fingers in both hands. (R. 732.) Decreased sensation to pinprick and light touch was exhibited in both upper extremities. (*Id.*) Under clinical impression, Dr. Panagos noted the following: 1) chronic lower back pain with herniated discs, chronic cervical spine neck pain with

---

[2] An FCE performed either by a physician or by a physical or occupational therapist, is "a battery of physical tests that assesses whether an injured employee is able to return to work and in what capacity." *Goetzke v. Ferro Corp.,* 280 F.3d 766, 770 (7th Cir. 2002).

herniated discs, secondary to fall; 2) hypercholesterolemia; 3) ADD, depression; 4) migraine headaches; and 5) initially hyperthyroid, not hypothyroid.  (R. 732-33.)

### 5. Mental Health Treatment Records

In addition to the treatment outlined above, Claimant has also been treated for a history of mental health symptoms.  In the months and years prior to Claimant's December 2011 alleged disability onset date, Claimant was diagnosed with ADD/ADHD, generalized anxiety disorder with panic attacks, posttraumatic stress disorder (PTSD) with an affective component, depressive disorder, not otherwise specified (NOS), and bipolar disorder.  (R. 36, 605–08, 689–715, 789–808.)  Although Claimant's mental health symptoms are noted at various points during her physical health treatment, the record does not indicate that Claimant has engaged in any regular mental health treatment during the relevant period.

In April 2013, Claimant underwent a psychosocial assessment by Rachel Kazez, MA.  (R. 829–37.)  At that time, Claimant reported racing thoughts, appetite and sleep disturbances, daily sadness, hopelessness, and a depressed, anxious, and frustrated mood.  (R. 831–32, 836.)  When asked what other factors may be clinically significant, she explained that her depression is connected to her back pain and inability to work, but she cannot get surgery until she is on medication for depression.  (R. 835.) Claimant exhibited psychomotor agitation and presented with a constricted affect during the mental status portion of the examination.  (R. 831–32.)  Ms. Kazez determined that Claimant had major depressive disorder, with an estimated global assessment functioning (GAF) score of 41-50.[3]  (R. 831.)

---

[3] A score between 41 and 50 indicates "serious symptoms" or a "serious impairment in social, occupational, or school."  *See Steele v. Colvin*, No. 14 C 3833, 2015 WL 7180092, at *1 (N.D. Ill. Nov. 16,

### 6. Mental Health Agency Consultants

Henry Fine, M.D., performed a consultative psychiatric evaluation on August 27, 2012.  (R. 736–40.)  Dr. Fine further noted that Claimant appeared depressed and was "clearly in pain, with little range."  (R. 738.)  She stated that she mostly stays at home and does what she can, depending on the pain.  (R. 737.)  She reported a variety of psychiatric symptoms, including poor sleep, decreased memory, forgetfulness, poor concentration, and intrusive thoughts.  (R. 737.)  Claimant was able to recall six digits forward and four backward, remembered five out of five words after a delay, and had intact recent and remote memory.  (R. 738–39.)  Dr. Fine diagnosed Claimant with PTSD with affective component and possible ADHD.  (R. 739.)

In January 2013, State agency consultant Tyrone Hollerauer, Psy.D., found Claimant to be moderately limited in (1) her ability to maintain attention and concentration for extended periods; (2) her ability to work in coordination with or in proximity to others without being distracted by them; (3) her ability to interact appropriately with the general public; and (4) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 281–83.)

### C. Claimant's Testimony

Claimant testified on October 17, 2014, and was 48 years old at the time of her testimony.  She testified that she experienced numbness following a fall in November 2011 at work that resulted in a broken collarbone, and she began to suffer diffuse pain

---

2015).  A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  *Id.*  Anything above 60 would indicate mild symptoms.  *Id.*

following a second injury.  (R. 129, 131, 135.)  She was unable to finish a course of physical therapy because the exercises aggravated her pain.  (R 132.)  She testified at length about her various pains and difficulties as a result of the pain.  According to Claimant, the pain radiated from the neck to the legs, her back pain felt as if a knife pierced the center of the back, her leg pain made walking difficult, pain in the left arm radiated from the wrist to the shoulder, and lifting or lowering the head aggravated the pain.  (R. 133-34, 136, 138, 195.)  She dropped items that she held with the right hand and had difficulty opening bottles, so she tried to use her left arm and hand for everything.  (R. 139-40.)  She was sometimes unable to fully bear weight on the right leg.  (R. 150.)  Sitting caused numbness in the back above the buttocks.  (R. 152–53.)  She sometimes suffered numbness in the right foot.  (R. 153.)  Claimant testified that lying inverted for 15 to 30 minutes at one time on her chaise lounge sometimes relieved back pain.  (R. 161–62.)

Claimant testified that the worst pain was in her neck, followed by a hump in her back that feels like a knife going through her back.  (R. 160.)  She also explained that she fell 14 to 15 times due to the pain, once falling down 18 stairs.  (R. 163.)  The injections and exercises given to her by doctors did not help.  (R. 166-67.)  She had headaches that could last up to three to four days.  (R. 202-03.)  When asked what she did to pass the time, Claimant testified that she tried to stay distracted but that it is difficult.  (R. 172-73.)  She explained that she was used to working and being independent, so her current situation was very upsetting.  (R. 173.)  Although Claimant's testimony was at times confusing, she clarified that she has not been giving home care

in some time because she has too much difficulty even leaving her own house.  (R. 184-85)

With respect to her mental conditions, she testified that she loses focus and her mind drifts.  (R. 175.)  She suffered anger and social isolation, difficulty focusing, and mood swings.  (R. 170, 175, 198.)  She tried to get counseling, but it did not work out.  (R. 185-86.)

### D. Vocational Expert's Testimony

Vocational expert Lee Knutson was present and testified at Claimant's administrative hearings.  (R. 210–28, 61–103.)  The ALJ questioned the VE about the availability of jobs to a hypothetical individual who retained Claimant's residual functional capacity ("RFC").  (R. 213–14.)  The VE indicated that although the RFC is for less than the full range of light work, the limitations in standing and walking provided herein significantly eroded the light occupational base, essentially to the extent where only sedentary work remains.  (R. 214.)  He testified that, while the hypothetical individual could not have performed Claimant's past relevant work, she could perform the jobs of assembler, inspector/checker/weigher and order clerk.  (R. 214–16.)  The ALJ then asked if the availability of the jobs he had listed would be eroded if the hypothetical individual was additionally limited to occasional overhead reach and frequent gross and fine manipulation.  (R. 216–17.)  The VE opined that, although the DOT does not differentiate between reaching overhead or in all directions, the jobs would remain, with no significant change in the numbers.  (R. 217.)

However, if the individual could only occasionally use her hands, she could not perform any of the jobs that the VE identified or any other work at the sedentary

exertional level.  (R. 214–17.)  The ALJ further questioned the VE about a hypothetical individual who has difficulty sustaining work tasks and cannot get through a typical work day because of pain, side effects from medications, or "distraction, in terms of inability to concentrate or focus on tasks.  (R. 219–20.)  The VE opined that all work would be precluded if an individual cannot sustain throughout the work day.  (R. 220.)  If the individual required six additional breaks of 15 minutes each in addition to the breaks that were included in a workday, was off-task for more than 15 percent of the workday, or was absent from work ten percent of the time she would be precluded from competitive employment.  (R. 218–20.)  To perform the jobs of assembler or inspector/checker/weigher, an individual needed to maintain average to-above average pace.  (R. 89–90.)  The VE indicated that an individual would not be employable if she could not keep a productive work rate for the two hours between breaks.  (R. 91–92.)

## II. LEGAL ANALYSIS

### A. ALJ Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).  This Court will

"conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," although he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 990 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted)).

## B. Analysis under the Social Security Act

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. Before proceeding from step three to

step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

### C. The ALJ'S Determination

Here, the ALJ found at step one that Claimant had not engaged in substantial gainful activity since her alleged onset date of December 9, 2011. (R. 21.) At step two, the ALJ concluded that Claimant suffered from the following severe impairments: degenerative disc disease, depression and anxiety. (R. 22.) Next, at step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1. (R. 26.) The ALJ then assessed Claimant's RFC and determined that Claimant could lift and carry up to 20 pounds occasionally and ten pounds frequently, but her ability to stand and/or walk is limited to a total of two hours in an eight-hour workday, and may frequently climb ramps and stairs. (R. 28.) Claimant may frequently balance, kneel, crouch, and crawl, occasionally stoop, and should avoid climbing ladders, ropes, and scaffolding. (*Id.*) Additionally, the ALJ found that Claimant was limited to simple, routine, and repetitive tasks, but could perform such tasks in two-hour increments throughout the typical eight-hour workday, and that Claimant should not be required to engage in teamwork or tandem tasks, with only occasional changes

in work tasks and only occasional decision making as part of the work tasks.  (*Id.*)

Based on the RFC assessment, the ALJ concluded at step four that Claimant was unable to perform any past relevant work.  (R. 44.)  Lastly, at step five, the ALJ found that given Claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Claimant could perform, such as assembler, inspector/weigher/checker, or order clerk.  (R. 45.)  Therefore, the ALJ found that Claimant had not been under a disability from December 9, 2011, through the date of her decision.  (R. 51.)

## III. ANALYSIS

Claimant now argues that (1) the ALJ erred in assessing Claimant's RFC, (2) the ALJ erred in weighing medical opinion evidence, (3) the ALJ erred in relying on the VE's testimony at step five, and (4) the ALJ improperly assessed the credibility of Claimant's subjective allegations.

### A. The ALJ Failed to Adequately Address Claimant's Moderate Impairments in Concentration, Persistence, and Pace in the RFC or in the Hypothetical Questions She Posed to the VE.

Claimant first contends that the ALJ erred in omitting her moderate limitations in concentration, persistence and pace from the hypothetical questions she posed to the VE, even though the ALJ found that such limitations exist.  For the reasons that follow, the Court concludes that the ALJ's hypothetical questions to the VE did not properly include Claimant's limitations in concentration, persistence, and pace, necessitating remand.

At step five, the Commissioner must demonstrate the existence of "significant numbers of jobs in the national economy."  20 C.F.R. § 404.1545(a)(5)(ii).  In doing so,

an ALJ may rely on the testimony of a VE to whom he poses hypothetical questions that account for the claimant's age, education, work history, and RFC. 20 C.F.R. § 404.1520(a)(1)(v), (g). In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Indoranto v. Barnhart*, 375 F.3d 470, 473-74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record.").

"Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, 794 F.3d 809, 813-14 (7th Cir. 2015). Although it is not necessary that the ALJ use the precise terminology of "concentration," "persistence," or "pace," the Court cannot assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record or has heard testimony that directly addressed Claimant's limitations in concentration, persistence, and pace. *Id.* at 814; *Yurt*, 758 F.3d at 857; *O'Connor-Spinner*, 627 F.3d at 619. Here, the VE testified to having reviewed only Claimant's prior work and vocational background. (R. 210.) Furthermore, although the VE was present at the hearing and thus heard Claimant's testimony, the record does not indicate that the VE based his conclusions on anything other than the ALJ's hypotheticals. The VE's testimony only addressed the ALJ's hypotheticals, and accordingly, the Court cannot

assume that the VE based his testimony on anything but those hypotheticals. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

The ALJ herself determined that Claimant suffered moderate difficulties in maintaining concentration, persistence, and pace. (R. 27.) It logically follows, therefore, that she was required to include these limitations in the hypothetical questions she posed to the VE. *See O'Connor-Spinner*, 627 F.3d at 619. However, instead of posing a hypothetical that included moderate limitations in concentration, persistence, and pace, the ALJ posited an individual limited to the simple, routine and repetitive tasks, to be performed in two-hour increments throughout the typical workday. (R. 213.) These terms refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days." 20 C.F.R. §§ 404.1568, 404.1520. But "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." *Varga*, 794 F.3d at 814. For this reason, the Seventh Circuit has repeatedly rejected the idea that hypotheticals like those at issue here, "confining the claimant to simple, routine tasks and limited interactions with others adequately capture[] temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858-89 (*citing Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) (collecting cases)).

The Commissioner argues that, by prohibiting Claimant from performing jobs that required teamwork, tandem tasks, or more than occasional decision-making, the ALJ was not required to include specific limitations in concentration, persistence, or pace in her RFC assessment. However, the ALJ never indicated that her inclusion of any of the

aforementioned restrictions had any relation to Claimant's moderate limitations in concentration, persistence, or pace. In fact, the ALJ explicitly stated that, in concluding that Claimant was moderately limited in her ability to sustain adequate concentration, persistence, and pace, Claimant was "accommodated with a limitation to unskilled work." (R. 27.) This Court must confine its review to the reasons articulated by the ALJ and cannot consider the Commissioner's post-hoc attempt to supplement the ALJ's assessment of the evidence. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2012); *see also Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010).

The VE specifically testified that two of the jobs the ALJ ultimately found Claimant capable of performing (assembler and inspector/weigher/checker) required an individual to maintain at least average to above average speed. (R. 89–90.) None of the hypothetical questions posed to the VE contained sufficient information to allow the VE to appropriately assess whether a person with Claimant's limitations could maintain the average to above-average pace required by these jobs. *See Varga*, 794 F.3d at 815. Had the ALJ included Claimant's moderate limitations in concentration, persistence, and pace in the hypothetical questions she posed, the VE may have rendered different conclusions about the number of jobs Claimant would be capable of performing. On remand, the ALJ shall pose questions that "explicitly account for documented limitations of 'concentration, persistence, or pace.'" *Stewart*, 561 F.3d at 684.

## B. The ALJ Did Not Properly Evaluate the Treating Medical Opinion Evidence.

Claimant additionally contends that the ALJ failed to consider the "checklist of factors" that is outlined in 20 C.F.R. § 404.1527(c) in determining what weight to give

the medical opinion evidence, and further failed to provide sound reasoning for rejecting the August 2012 opinion of treating neurosurgeon, Dr. Lichtenbaum, that Claimant should remain off work. For the reasons set forth below, remand is required on this issue.

### 1. The Regulatory Checklist of Factors

Even when an ALJ provides good reasons for not giving controlling weight to the opinions of a treating physician, she still must determine and articulate what weight, if any, to give the opinion. *Larson v. Astrue*, 615 F.3d 755, 751 (7th Cir. 2010). In making that determination, the regulations require the ALJ to consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization, if applicable; and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(c); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Here, the ALJ afforded Dr. Lichtenbaum's opinions limited weight, but her opinion does not address the checklist of factors in making this determination. *See Larson*, 615 F.3d at 751 (criticizing the ALJ's decision, which "said nothing regarding this required checklist of factors"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play").

Multiple factors favor crediting Dr. Lichtenbaum's opinions, and appropriate consideration of these factors may have caused the ALJ to accord greater weight to Dr.

Lichtenbaum's opinions.  *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

The ALJ first failed to address Dr. Lichtenbaum's specialty as a neurosurgeon, and thus

a specialist in the very impairments from which Claimant suffered.  Dr. Goldberg and Dr.

Xie, whose opinions the ALJ afforded great weight, possessed no such specialty.

Dr. Lichtenbaum also saw and evaluated Claimant on four separate occasions,

and the treatment relationship lasted for over a year.  The more frequently that a

physician has treated a claimant, the more weight that physician's opinion merits.  20

C.F.R. § 404.1527(c)(2)(i).  Dr. Goldberg, on the other hand, examined Claimant only

twice, and both examinations were in the context of evaluation in connection with

Claimant's workers' compensation claim.  Similarly, Dr. Xie had only one opportunity to

evaluate Claimant before arriving at his opinion.

In addition, Dr. Lichtenbaum's findings and opinions are supported by other

medical evidence in the record.  For example, Dr. Panagos' consultative examination

that also took place during August 2012 revealed cervical vertebral and paravertebral

tenderness and diminished cervical flexion, extension, and bilateral bending and

rotation with pain; lower lumbar vertebral and paravertebral tenderness and diminished

lumbar flexion, extension, and bilateral extension with pain; slow, shuffling, and swaying

ambulation; inability to perform tandem gait; diminished finger grasp and hand grip

bilaterally; and difficulty opposing the fingers bilaterally.  (R. 731–32.)  The ALJ offered

no discussion or explanation regarding how she concluded that this evidence was

inconsistent with Dr. Lichtenbaum's opinions.  Furthermore, Dr. Lichtenbaum's opinions

that Claimant should remain off work are also consistent with the opinions of two other

treating physicians, Dr. Rozenyk and Dr. Simon.  (R. 875, 1108.)  The more consistent

that a physician's opinion is with other evidence of record, the more weight that opinion merits. 20 C.F.R. § 404.1527(c)(4).

Finally, in considering how much weight to give a medical opinion, the regulations also require the ALJ to consider other factors which tend to support or contradict the medical opinion. 20 C.F.R. 404.1527(c)(6). The ALJ specifically noted that "medical reports generated in the context of a workers' compensation claim are adversarial in nature, and the physicians retained by either party in the context of workers' compensation cases are often biased and do not provide truly objective opinions." (R. 38.) Despite this acknowledgment, the ALJ failed to explain how she determined that Dr. Goldberg's interpretation of the objective medical evidence merited greater weight than a treating specialist's interpretation.

### 2. The Treating Physician Rule

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 613, 636 (7th Cir. 2013). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, "an ALJ must offer 'good reasons' for discounting a treating physician's opinion," *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and "can reject an examining physician's

opinion only for reasons supported by substantial evidence in the record." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2012) (citing 20. C.F.R. §§ 404.1527(c)(1)) (other citation omitted). The Court notes several deficiencies in the ALJ's reasons for not affording Dr. Lichtenbaum's opinions controlling weight.

The ALJ concluded that Dr. Lichtenbaum's opinions were worthy of only "little weight," for the opinions were unsupported by the objective medical evidence as a whole. (R. 41.) More specifically, the ALJ determined that Dr. Lichtenbaum's opinions (1) were based in large part on Claimant's subjective allegations; (2) were inconsistent with Claimant's work as a home healthcare aide; and (3) were inconsistent with his own treatment records. (R. 40–41.) The ALJ further concluded that Dr. Lichtenbaum had misinterpreted the results of the August 2012 MRI because his interpretation differed from that of two other physicians. (R. 41.)

As an initial matter, if an opinion is "based *solely* on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added). However, almost all diagnoses require some consideration of the claimant's subjective symptoms, and here, Claimant's subjective statements were necessarily factored into Dr. Lichtenbaum's analysis and ultimate conclusions. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). Dr. Lichtenbaum reached his conclusion after considering Claimant's subjective complaints, the MRI evidence, and the results of his own testing and physical examination of Claimant.

Second, Claimant's purported failure to disclose that she had been working part time as a home healthcare provider was not an appropriate basis for the ALJ to further discount Dr. Lichtenbaum's opinions. The record indicates that Claimant disclosed this information to Dr. Lichtenbaum when she first presented to him in February of 2012. (R. 944.) Furthermore, the Seventh Circuit has recognized that a claimant will sometimes "be working beyond his capacity out of desperation," and the fact that a person holds down a job is not proof that he is not disabled. *Henderson v. Barnhart*, 349, F.3d 434, 435 (7th Cir. 2003); *see also Czarnecki v. Colvin*, 595 F. App'x 635, 644 (7th Cir. 2015) (A claimant "should not be penalized for *trying* to work through her pain.") (emphasis in original).

Finally, the ALJ's explanation of her determination that Dr. Lichtenbaum's opinion also merited little weight because he found evidence of significant cord compression upon review of the August 2012 MRI is somewhat questionable. The ALJ noted that neither Dr. Goldberg nor Dr. Boyer found evidence of cord compression; however it is unclear whether they reviewed the same MRI. (R. 41.) The record indicates that Dr. Boyer reviewed MRI evidence when Claimant first sought treatment from him in February 2014, and he concluded that there was evidence of significant cord compression. (R. 1026.) Dr. Boyer noted that the MRI he reviewed at this initial visit was over a year old, but it is unclear if this "old" MRI was from August 2012, or from March 2013.

Based on the above shortcomings and, viewing the record as a whole, the Court concludes that the ALJ's consideration of the medical opinion evidence is insufficient and not supported by substantial evidence, and remand is required. On remand, the

ALJ shall reevaluate the weight to be afforded to Dr. Lichtenbaum's opinions and properly explain her reasoning. If the ALJ finds "good reasons" for not giving Dr. Lichtenbaum's opinion controlling weight, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Lichtenbaum's opinions. Additionally, although not directly challenged by Claimant on appeal, the ALJ should also re-evaluate the weight given to the opinion of Dr. Xie, for the Court notes that the ALJ erroneously interpreted the medical record.[4]

## C. Remaining Issues

Claimant further argues that the ALJ erred in relying on the VE's testimony at step five and that the ALJ improperly assessed the credibility of Claimant's subjective allegations. The VE's opinion and the ALJ's assessment of Claimant's subjective symptoms, however, may be affected by the ALJ's reexamination of the RFC and treating physician opinions. Accordingly, the Court need not address the remaining arguments at this time. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and her ultimate conclusions,

---

[4] The ALJ concluded that Dr. Xie had opined that Claimant had no work restrictions and afforded this opinion great weight. (R. 39.) However, the only mention of work restrictions in Dr. Xie's May 2014 note is under the "subjective" portion of the record, under "History of Present Illness" (HPI). (R. 1034.) The HPI is not representative of a doctor's medical opinion. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *9 (N.D. Ill. Feb. 29, 2016). The record is unclear whether Claimant was describing her previous employment, indicating that she was not under work restrictions at that time. Nevertheless, Dr. Xie's notations in the HPI cannot be construed as a medical opinion that Claimant could return to work without restrictions, and it was error for the ALJ to consider it as such. *See Snedden*, 2016 WL 792301, at *9.

whatever those conclusions may be.  *See, e.g., Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994).

## IV. CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the final decision of the Commissioner is granted and the Commissioner's motion for summary judgment is denied.  This matter is remanded for further proceedings consistent with this Opinion.


**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: August 24, 2017**